[Cite as *In re A.R.-B.*, 2019-Ohio-2463.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MIAMI COUNTY**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| | : | |
| IN RE: A.R.-B. | : | Appellate Case No. 2019-CA-1 |
| | : | |
| | : | Trial Court Case No. 21330384 |
| | : | |
| | : | (Appeal from Common Pleas Court – |
| | : | Juvenile Division) |
| | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 21st day of June, 2019.

. . . . . . . . . . .

JEREMY M. TOMB, Atty. Reg. No. 0079554, 124 W. Main Street, Troy, Ohio 45373
    Attorney for Defendant-Appellant, Mother

JULIA C. KOLBER, Atty. Reg. No. 0078855, 12 W. Monument Avenue, Suite 200,
Dayton, Ohio 45402
    Attorney for Plaintiff-Appellee, Father

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Mother appeals from a judgment of the Miami County Court of Common Pleas, Juvenile Division, which denied her motion for a change of custody. She claims that the trial court abused its discretion in finding that there was no change of circumstances under R.C. 3109.04. For the following reasons, the trial court's judgment will be affirmed.

## I. Factual and Procedural History

{¶ 2} Mother and Father have a daughter, A.R.-B., who was born in December 2011. In October 2015, Father was named the residential and custodial parent of A.R.-B. Father resides on the Caribbean island of St. Maarten[1]; Mother resides in Ohio.

{¶ 3} On September 6, 2017, St. Maarten was hit by Hurricane Irma, a Category 5 hurricane. Father and A.R.-B. remained on the island during the storm. Two other less-damaging hurricanes followed. The following month, Mother filed a motion for a change of custody, claiming that she was concerned about her daughter's safety on the island "until such time as the island is able to function and sustain its populace again."

{¶ 4} After a pretrial conference, the magistrate ordered that the change of circumstances issue be litigated first, and if Mother "clear[e]d the change of circumstance statutory hurdle," that a guardian ad litem would be appointed and a separate hearing would be held on the issue of the best interest of the child. (Doc. #195.) On April 27, 2018, the magistrate held a hearing on the change of circumstances issue. The magistrate subsequently ruled that no change of circumstances had occurred. Mother objected to the magistrate's decision. Upon review, the trial court agreed with the

---

[1] The island contains two countries: Saint-Martin (French territory), which consists of the northern part of the island, and Sint Maarten (Dutch territory), which consists of its southern part.

magistrate that Mother had not met her burden of proof regarding a change of circumstances.

{¶ 5} In her sole assignment of error, Mother claims that the trial court erred in concluding that there was no change of circumstances under R.C. 3109.04.

## II. Change of Circumstances

{¶ 6} R.C. 3109.04(E) addresses the modification of a prior decree allocating parental rights.   It provides, in pertinent part:

> The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child.   In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:
>
> * * *
>
> (iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

R.C. 3109.04(E)(1)(a).

{¶ 7} R.C. 3109.04 does not define the phrase "change in circumstances." However, Ohio courts have held the phrase pertains to "an event, occurrence, or situation

which has a material and adverse effect upon the child." *In re A.P.*, 2d Dist. Montgomery No. 28023, 2019-Ohio-139, ¶ 23, quoting *Pierson v. Gorrell*, 12th Dist. Butler No. CA 2011-11-216, 2012-Ohio-3878, ¶ 13. "A change in circumstances must be one of substance, not slight or inconsequential, to justify modifying a prior custody order." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997); *Wiram v. Wiram*, 2d Dist. Clark No. 2017-CA-32, 2017-Ohio-7436, ¶ 5.

> "The clear intent of [R.C. 3109.04] is to spare children from a constant tug of war between their parents who would file a motion for change of custody each time the parent out of custody thought he or she could provide the children a 'better' environment. The statute is an attempt to provide some stability to the custodial status of the children, even though the parent out of custody may be able to prove that he or she can provide a better environment."

*Davis* at 418, quoting *Wyss v. Wyss*, 3 Ohio App.3d 412, 416, 445 N.E.2d 1153 (10th Dist.1982); *In re G.B.*, 2d Dist. Montgomery No. 27601, 2017-Ohio-8418, ¶ 31.

{¶ 8} In determining whether a change of circumstances has occurred, a trial judge "must have wide latitude in considering all the evidence," and we review the court's determination for an abuse of discretion. *In re A.P.* at ¶ 23. Abuse of discretion is a term used to indicate that a trial court's decision is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). In most instances, an abuse of discretion will result in a decision that is simply unreasonable, rather than unconscionable or arbitrary. *Chaney v. Chaney,* 2d Dist. Montgomery No. 24880, 2012-Ohio-626, ¶ 9.

{¶ 9} The parties presented the following evidence at the April 27, 2018 hearing.

{¶ 10} In September 2017, a series of hurricanes hit St. Maarten, the first of which, Hurricane Irma, made landfall as a Category 5 hurricane on September 6. Father testified that he had 24-hours' notice that Hurricane Irma would be a direct hit, but he had been aware of the hurricane for approximately one week. Father indicated that the island often gets "the tail end" of hurricanes, so many people "played it off like it wasn't gonna be a very big hurricane."

{¶ 11} Father acknowledged that he could have left the island prior to Hurricane Irma's arrival, but he testified that he did not leave the island, because he had no need to leave. He explained that his house was "made of concrete and strong," that his home was located in the center of the island, not in a flood zone, and that he initially did not believe that the hurricane would be as massive as it ended up being. Father denied that he had risked his daughter's life by remaining on the island. He explained that there was nothing wrong with his house, it was "structurally sound" and "hurricane proof," that he still had a job, and that his daughter was not in harm's way. Father stated that one block of a glass block window was damaged by debris from the hurricane but he did not need to make changes to his home after the hurricane and the family did not lose any personal belongings in the storm.

{¶ 12} Father stated that he prepared for the hurricane by gathering non-perishable food, purchasing candles, and filling a 55-gallon water tank for washing clothes, plates, and the like. Father stated that he had adequate supplies, but the next time he would buy more candles and more Cheetos for his daughter. Father stated that he lost water and electricity for approximately four weeks, but all utilities had been

restored in his home. Before utilities were restored, Father had access to a reverse osmosis plant, which converted salt water to fresh water, and he brought home five to ten gallons of water every day for flushing toilets and showering.

{¶ 13} Father acknowledged that the island sustained massive damage from Hurricane Irma, that water, sewer, and electricity were out for some period of time, and that his daughter's school was closed for three weeks. He estimated that 65 to 70 percent of buildings on the island sustained some damage. When asked about the evacuations of Americans from the island after Irma, Father stated that mostly tourists were evacuated. Father acknowledged that his father's wife and their five-year-old son, who also live on the island, left before the hurricane, but Father stated that they left for other reasons.

{¶ 14} Father agreed that there were issues with security and safety on the island immediately after the hurricane, particularly looting in Phillipsburg. Father was asked about the marina that his father owns. Father testified that the big dock, where the bigger boats come in, was "completely wiped," and that four yachts were submerged by the storm.

{¶ 15} Father stated that several small grocery stores reopened a few weeks after the hurricane. Father indicated that, at the time of the hearing, he had no trouble purchasing food (including fresh fruits and vegetables), school supplies, clothing, gasoline, and other necessities. Father stated that he went to work the day after the hurricane, and he did not suffer any loss of income. At the time of the hearing, the marina, which was near the club where Father worked, was at 85 percent occupancy. He estimated that the island was then 90 to 98 percent operational. Father disagreed

with a newspaper article that indicated otherwise.

{¶ 16} Father stated that there were several different hotels in operation on the island, although some were closed and being remodeled or rebuilt. Father indicated that the original airport building was not operational, but the airport was running with temporary areas for terminals. Father stated that his daughter's pediatrician and dentist offices, as well as hospitals and pharmacies, were open. Father indicated that the police force was active, and there were additional officers from neighboring islands assisting it. Father testified that the roads were drivable, and no areas remained impassable. Father stated that the tourist industry "appears to be back and running." He indicated that he saw five cruise ships there approximately two months prior to the hearing.

{¶ 17} Father agreed that his daughter's school sustained damage and was closed until October 2, 2017, but the school had been repaired, and his daughter had been attending on a regular, daily basis. Father indicated that his daughter receives straight A's, and her report card stated that she sets a good example for the younger children. Father stated that the hurricane had not affected her academically.

{¶ 18} Mother testified that she first heard about Hurricane Irma on September 3, when it was a Category 3 hurricane. Mother stated that she contacted Father about flying their daughter back to the United States, but Father told her that the airport had closed. After the hurricane hit, Mother did not hear from Father for 15 hours. The next morning, Mother contacted Father's stepmother, who informed Mother that Father and A.R.-B. were alive. Later on September 6, Mother received a photograph from Father and A.R.-B.; Mother also spoke with her daughter over the phone, but the connection was poor. Mother testified that three days went by without additional contact. When Mother

heard about Hurricane Jose a couple of weeks later, she again asked Father to send their daughter to the United States, but Father would not.

{¶ 19} Mother went to St. Maarten on November 7, two months after Hurricane Irma, and stayed for a week. Mother described the condition of the island, saying that compared to pre-Irma, there were "barely any" services available. She stated that few restaurants and supermarkets were open, and the resort in which she stayed housed mainly relief workers and members of the Red Cross. Mother presented photographs taken during her November visit by a private investigator she had hired; the photographs included photographs of her daughter's school and the pharmacy nearby. Mother stated that trash "was everywhere" and piled along the roads. Mother testified that she continued to have concerns about her daughter's safety.

{¶ 20} Mother testified that, during the November visit, her daughter's demeanor and attitude were "completely different than before." Mother stated that her daughter seemed very whiny, looked fatigued, seemed "neurotically occupied" with the hurricane, and her eyes were "blinking and twitching." Mother stated that her daughter did not want to engage in their usual activities together; she wanted to stay at Mother's hotel and watch her iPad or movies.

{¶ 21} Mother most recently visited the island on April 20, 2018, a week before the hearing. Mother stated that the condition of the island had "definitely improved," but she still had concerns about her daughter's living there. Mother stated that the airport was using tents as terminals, and the flight options to and from St. Maarten were more limited and more expensive.

{¶ 22} Mother acknowledged that A.R.-B.'s school reopened on October 2, 2017,

and that her daughter had been going to school for seven months at the time of the hearing. Mother also indicated that Father's neighborhood was "relatively untouched [by the hurricane] in comparison to the rest of the island." Mother did not contend that Father was without adequate food and water because of the hurricane, that they lost their possessions, or that the daughter's medical or dental needs were neglected.

{¶ 23} Mother stated that, when she went to get her daughter for visitation in April 2018, she and her daughter spent time at the beach before flying to Ohio, and that Mother had no safety concerns at the beach.

{¶ 24} The magistrate concluded that Mother did not demonstrate that a change of circumstances had occurred to warrant a modification of custody. The magistrate stated:

31) * * * While the Island suffered significant damage, [Father's and A.R.-B.'s] home was largely untouched and they had sufficient supplies. [Father] returned to work the day after the hurricane and has remained employed and able to financially provide for [A.R.-B.] The family did not lose any possessions and were not the victims of looting or violence. [A.R.-B.'s] school was out of commission for a few weeks but this break did not negatively affect her grades. [Mother's] contention that [A.R.-B.] was "different" during her November visit was ambiguous and unsubstantiated. No testimony or evidence was provided regarding [A.R.-B.'s] more recent behavior and demeanor.

32) Much of St. Martin has been rebuilt and is once again a functioning tourist destination. [A.R.-B.] remains in her family home and goes to the

same school with her same friends. She continues to see her mother according to the current visitation agreement.

33) The Magistrate will not second guess [Father's] decision regarding evacuation. As the residential parent, it is his job to make decisions which he believes to be in [A.R.-B.'s] best interest. He did this based on his experience living in St. Martin and with the information he had. [Father] took precautionary measures to ensure [A.R.-B.'s] well-being and she was safe and provided for.

**{¶ 25}** In her supplemental objections to the magistrate's decision, Mother emphasized the destructiveness of Hurricane Irma and Father's decision to remain on the island despite his ability to leave. Mother stated that it "was a miracle that [Father and daughter] were spared injury and further property damage." Mother characterized Father's behavior as "rolling the dice" on his and their daughter's safety and security. Mother argued that "[t]his is the exact type of situation where the court should involve itself, where the custodial parent lacks good sense in providing for the safety and security of his children."

**{¶ 26}** In overruling Mother's objections, the trial court emphasized that Father had 24-hours' notice of a possible direct hit and of the intensity of Hurricane Irma. The court cited Father's testimony that there was no need to evacuate the island, because his home was concrete, strong, and located in the center of the island. The trial court noted that, while damage to the island was severe and devastating, the damage to Father's home was minimal. The court concluded:

This court does not make "light" of the terrible aftermath of Hurricane

Irma on Sint Maart[e]n – people died and suffered. But, in this case, the court has previously determined that father is the residential custodian and charged with the responsibility to make decisions for his daughter – which should be in her best interest. Neither does this court imply that father has a "free pass" to decisions of the child's welfare concerning future action. However, under these circumstances, including the lack of damage to father's home, the court does not find that he was playing "Hurricane Roulette" as characterized by mother. Despite mother's objection to the term "second guessing" by the magistrate in her decision, this court will not do so either.

The motion for reallocation is denied as mother has not met her burden of proof concerning a change of circumstances.

{¶ 27} We find no abuse of discretion in the trial court's determination. The record reflects that Father, a resident of Sint Maarten, reasonably believed that the family could safely weather the hurricane in place and that he prepared for the hurricane's arrival by gathering food and potable water. Although the island suffered severe damage, Father's home was minimally damaged, the family did not lose any personal possessions as a result of the storm, and Father was able to return to work the day after the hurricane. Although A.R.-B.'s school was closed for three weeks and the home lacked utility services for approximately one month, none of those conditions had long-term detrimental effects. At the time of the hearing, Sint Maarten was rebounding economically, and all necessary services (food, medical treatment, fuel, education, clothing, etc.) were available for A.R.-B. The trial court reasonably concluded that Father's decision to stay on Sint Maarten

and the hurricanes' effects on the island did not constitute a change of circumstances under R.C. 3109.04(E).

**{¶ 28}** Mother's assignment of error is overruled.

### III. Conclusion

**{¶ 29}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and TUCKER, J., concur.

Copies sent to:

Jeremy M. Tomb
Julia C. Kolber
Hon. Scott Altenburger